IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**JERRY DON RAGLAND**                                                                                      **PLAINTIFF**

V.                                    CASE NO.: 3:15-CV-3045

**JOHNNY HINCHEY, individually and in his
capacity as County Judge for Searcy County,
Arkansas; and SEARCY COUNTY, ARKANSAS**                            **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Now pending before the Court are a Motion for Summary Judgment (Doc. 13) and Brief in Support (Doc. 14) filed by Johnny Hinchey in his official capacity only, and by Searcy County, Arkansas (collectively, "County Defendants"). Plaintiff Jerry Don Ragland filed a Response in Opposition (Doc. 17) and a Brief in Support (Doc. 18), and County Defendants filed a Reply (Doc. 20). Both sides also submitted deposition testimony and other evidence in support of their positions on summary judgment. Now that the Motion for Summary Judgment is ripe for decision, the Court finds it should be **GRANTED** for the reasons explained below.

### I. BACKGROUND

According to the Complaint and the depositions submitted in this case, on or about the morning of Thursday, July 24, 2014, Mr. Ragland was drinking coffee and talking politics at the Harps grocery store deli in Marshall, Arkansas, along with others, including Sonny Wood, Charmaine Seaton, Eugene Raybee, and J.C. Beavers. (Doc. 15-2, p. 10). During that conversation, Mr. Ragland speculated aloud that Mr. Hinchey, who was Searcy County Judge at the time, might have taken bribes in exchange for awarding contracts to

complete government work. *Id.* ("I said if they wanted to slip him back some money, there wouldn't be no way nobody could know; nobody would know if they got a contract and he slipped him back money.").

Mr. Hinchey admits that "more than one individual" told him about Mr. Ragland's comments in the Harps deli. (Doc. 15-1, p. 45). Mr. Hinchey testified it was his understanding that Mr. Ragland had told the group at Harps "he had proof that I stole some money from the county." *Id.* at p. 44. Two days later, on the morning of Saturday, July 26, 2014, Mr. Ragland was working in a field owned by Elton Smith, erecting a fence on Mr. Smith's property. (Doc. 15-2, p. 11). The field was "not very far from Johnny's house," maybe three or four miles away. *Id.* at p. 12. As to the question of whether anyone would have known where Mr. Ragland was working that particular morning, he testified: "everyone knows me and if they're talking, they know where I'm working at . . . ." *Id.* at p. 30.

Mr. Hinchey testified that he merely "happened upon" Mr. Ragland's truck parked alongside the Smith property. (Doc. 15-1, p. 44). Mr. Hinchey parked his own truck near Mr. Ragland's and walked about 50 feet into the field where Mr. Ragland was working. *Id.* at p. 47. The men then began talking, and the talking turned to arguing. *Id.* at p. 44. According to Mr. Hinchey, Mr. Ragland swung his hammer at him, and then in self-defense, Mr. Hinchey "slapped the piss out of him." *Id.* at p. 47. Mr. Hinchey was under the impression that Mr. Ragland was not injured by the slap and recalls that Mr. Ragland "went back to building the fence before I even left." *Id.* at p. 48.

Mr. Ragland's recollection of the incident is vastly different. According to Mr. Ragland, Mr. Hinchey's truck was not visible to him from the spot where he was working on the fence, so he was surprised to find Mr. Hinchey suddenly approaching. (Doc. 15-2, pp. 18-19). Mr. Ragland recalls Mr. Hinchey walking toward him "really screaming loud" and saying, "have you been talking about me down at Harps." *Id.* at p. 12. Mr. Ragland denies that he swung a hammer at Mr. Hinchey. *Id.* at p. 19. Instead, the last thing Mr. Ragland remembers is Mr. Hinchey screaming at him, and then losing consciousness. *Id.* at p. 12. Mr. Ragland woke up to find Mr. Hinchey walking away from him, back to his own truck. *Id.* at pp. 12-13. Mr. Ragland's head was spinning, and he had a sharp pain in his side. *Id.* at p. 13. He believes he was tased. *Id.* His side hurt for two or three days, and he urinated blood. *Id.* at p. 14. He had a bump on the back of his head from where he assumes he fell or was kicked by Mr. Hinchey. *Id.* at p. 17. He also had a bruise on his side. *Id.* at p. 26.

The two men agree that one or two days after this altercation, Mr. Ragland went to the courthouse to talk with Mr. Hinchey. They shook hands and apologized to one another. *Id.* at p. 27; Doc. 15-1, p. 50. Mr. Ragland felt that "part of this was my fault for opening my mouth." (Doc. 15-2, p. 27). Mr. Hinchey does not deny striking Mr. Ragland.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical

inferences that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

### III.  DISCUSSION

County Defendants argue they should be granted summary judgment because Mr. Ragland cannot establish facts sufficient to show that Mr. Hinchey struck him under color of state law, or that an unconstitutional County policy or custom was the moving force behind any alleged violation of his First Amendment rights. In the lawsuit, Mr. Ragland has sued not only Searcy County, but also Mr. Hinchey in both his official and personal capacities. A suit against a public official in his official capacity is the equivalent of a suit

against the county itself. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Since the Motion for Summary Judgment does not seek relief on behalf of Mr. Hinchey in his personal capacity, this Opinion will focus only on whether summary judgment is proper as to Searcy County and Mr. Hinchey in his official capacity.[1]

> Title 42 U.S.C. § 1983 provides in relevant part:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Mr. Ragland asserts in his § 1983 claim that he suffered a violation of his constitutional rights due to an official policy or custom of Searcy County's, and due to the actions of Mr. Hinchey in his official capacity as County Judge.

The Supreme Court held in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 689 (1978), that municipalities and other local governmental bodies are "persons" within the meaning of § 1983. Accordingly, a county "may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). With that said, however, "'[a] municipality cannot be held liable solely because it employs a tortfeasor,' meaning the municipality cannot be held liable on a

---

[1] County Defendants mention in a footnote that Mr. Hinchey is also entitled to qualified immunity. Because this issue was not briefed by either party, the Court will not address it here. *See* Doc. 14, p. 4, n.2.

5

respondeat superior theory." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (quoting *Kuha v. City of Minnetonka*, 365 F.3d 590, 603 (8th Cir. 2003)).

Even if the Court were to assume that Mr. Hinchey was acting under color of law when he allegedly sought out Mr. Ragland and committed battery against him in retaliation for his speech, the Court finds that this isolated incident was not motivated by a Searcy County policy or custom of violating its citizens' First Amendment rights, or by the Searcy County legislative body's deliberate indifference to those rights.  The parties agree that Mr. Hinchey was the final decision-maker in the County when it came to certain defined governmental functions.  However, he did not singlehandedly create and authorize all policy on behalf of the County, and there is no evidence in the summary judgment record of any County custom or policy to silence political speech.  Arkansas Constitutional Amendment 55, Section 3 explains the authority of a county judge as follows:

> The County Judge, in addition to other powers and duties provided for by the Constitution and by law, shall preside over the Quorum Court without a vote but with the power of veto; authorize and approve disbursement of appropriated county funds; operate the system of county roads; administer ordinances enacted by the Quorum Court; have custody of county property; [and] hire county employees, except those persons employed by other elected officials of the county.

Clearly then, even though the county judge is considered to be the chief executive officer of the county, Ark. Code Ann. 14-14-502(b)(2)(i), this is not to say that the county judge is the final word on the county's legislative policy.  Instead, the county's quorum court, which is comprised of a minimum of nine elected justices of the peace, retains the power to: (1) override the veto of the county judge by a vote of three-fifths of the total membership; (2) fix the number and compensation of deputies and county employees; (3)

fill vacancies in elective county offices; and (4) adopt ordinances necessary for the government of the county.  Ark. Const. amend. 55, § 4.

Mr. Ragland alleges that Searcy County had a policy or custom of allowing then-County Judge Hinchey to use force against "those who opposed the County's policies." (Doc. 18, p. 4).  The only support Mr. Ragland offers for this argument is the fact that a handful of County residents filed civil lawsuits against Mr. Hinchey having to do with his official administration and oversight of the County's roads.  These lawsuits involved allegations that Mr. Hinchey trespassed on private property, used County equipment to tear out fences without sufficient authorization, and in one case removed a cattle guard from a roadway.  *See* Doc. 18, p. 4.  What these lawsuits have in common is the complaint that Mr. Hinchey improperly overstepped his authority in maintaining County roads and enforcing County ordinances.  The lawsuits do not, as Mr. Ragland suggests, establish a pattern of physical violence committed by Mr. Hinchey against citizens of Searcy County—whether for the purpose of silencing their public speech or for any other reason.  The lawsuits therefore have no bearing on the issues here.

The incident involving Mr. Ragland appears to have been an isolated one.  Although the Supreme Court has found that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," those "appropriate circumstances" have only been found when a "properly constituted legislative body" makes a policy decision that binds the municipality.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  Arguably, Mr. Hinchey possessed the authority when he was County Judge to make decisions and create policy on behalf of the County with respect to his exclusive sphere of influence:  the disbursement of county funds, the operation of county roads, the

administration of county ordinances, the custody of county property, and the hiring of county employees. Ark. Const. amend. 55, § 3. There is no indication, however, that he possessed the authority to make decisions on behalf of the County regarding political speech.

To show there was a County-wide policy of silencing citizens' political speech, Mr. Ragland would need to demonstrate more than he has here. He would have to establish facts amounting to: (1) a continuing, widespread, persistent pattern of unconstitutional misconduct by County officials and/or employees; (2) deliberate indifference to or tacit authorization of such conduct by the County's policymaking officials, *after* those officials received notice of the misconduct; and (3) proof that the County's policy was the moving force behind the violation of Mr. Ragland's constitutional rights. *See Mettler*, 165 F.3d at 1204.

Mr. Ragland has presented no evidence to show a widespread, persistent pattern by County officials—including Mr. Hinchey—to silence political speech. He has not established that the County's legislative body, the Quorum Court, received notice that Mr. Hinchey was exerting force or threats of force to silence speech. He has no proof that the County either directly or tacitly endorsed any policy that led to the violation of Mr. Ragland's rights. If anything, Mr. Hinchey's actions here, viewed in the light most favorable to Mr. Ragland, constitute a tort, and Searcy County "cannot be held liable solely because it employs a tortfeasor." *Kuha*, 365 F.3d at 603.

## IV. CONCLUSION

For the reasons explained herein, the County Defendants' Motion for Summary Judgment (Doc. 13) is **GRANTED**, and all claims against Defendants Searcy County and Johnny Hinchey, in his official capacity only, are **DISMISSED WITH PREJUDICE**. This leaves for trial all claims against Mr. Hinchey in his personal capacity.

**IT IS SO ORDERED** on this 27th day of July, 2016.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE